******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

D'AURIA, J., with whom PALMER, McDONALD and ECKER, Js., join, concurring. I agree fully with part II of the majority opinion. I also agree with the majority's conclusion in part I of its opinion that there is an insufficient record in the present case to afford the defendant, John White, review of his constitutional claim, let alone the new trial he requests on this direct appeal. Although I join the majority's opinion, I write separately because over the course of a quarter of a century as a civil servant, I have developed what I humbly believe to be a finely tuned ear to governmental refrains of "not my job" and "we don't have a budget for that." Thus, I feel compelled to comment on how often this bureaucratic jockeying can strike a discordant note that does not focus appropriately on the rights of the accused.

The defendant denies it was he who, in 2009, stabbed the victim with a box cutter and caused her serious injuries while she walked back to a friend's home from the store she had gone to for something to drink. The defendant went to trial without the assistance of a DNA expert to counter the state's expert, or at least to consult for purposes of cross-examination. This was perhaps not advisable. See P. Giannelli, "*Ake v. Oklahoma*: The Right to Expert Assistance in A Post-*Daubert*, Post-DNA World," 89 Cornell L. Rev. 1305, 1315 (2004) ("[f]ew defense attorneys can deal with this type of sophisticated evidence—which raises issues 'at the cutting edge of modern law and science'—without expert assistance" (footnote omitted)). The defendant claims this was not his preference but that, instead, the actions and inactions of several state agencies combined to place him in this predicament.

In 2013, the Waterbury police obtained information about a potential DNA match on a red sweatshirt recovered near the crime scene. Soon thereafter, the victim identified the defendant in a double-blind, sequential photographic array procedure. As the majority indicates, there is some dispute about how certain the victim said she was about her identification. Not until 2016 was the defendant arrested and charged with assault in the first degree in violation of General Statutes § 53a-59 (a) (1).

Two days after jury selection began, the state gave notice of its intent to offer DNA evidence pursuant to General Statutes § 54-86k and moved to sample the defendant's DNA by buccal swab pursuant to Practice Book § 40-34 (6). The state conceded at the time that this notice and motion were clearly untimely under § 54-86k (c). Although the state did not seek to justify (or apologize for) the late disclosure, the trial court—while emphasizing that "this is not an excuse" and not the proper way to try cases—was moved to put on the

record that the case had been assigned to another prosecutor before being reassigned to the prosecutor who tried the case and provided the late disclosure. For its part, the state focused on the fact that, in its view, there was no real prejudice to the defendant because "the DNA evidence was present from the onset." By this it appears that the state meant that the arrest warrant indicated that a DNA sample taken from the red sweatshirt had generated a "hit" from the CODIS DNA database,[1] linking the defendant to the DNA sample and leading the police to focus on him as a suspect.[2]

Over the defendant's objection, the trial court permitted the state to offer DNA evidence at trial and granted the state's motion for the buccal swab. To mitigate any prejudice to the defendant, however, the trial court suspended jury selection, dismissed the two jurors already selected, and permitted the defendant a continuance for as much time as he needed to attempt to locate an expert, reframe his defense, and prepare for trial in light of the state's late disclosure.[3]

The next day, the defendant filed with the trial court a motion for costs associated with the retention of a DNA expert. He argued that the state's late disclosure caused him a different kind of prejudice that could not be cured simply by a continuance. Particularly, the defendant's counsel, Attorney Ioannis A. Kaloidis, represented to the court that the defendant's wife had paid for his private counsel and for expenses related to retaining an eyewitness identification and memory expert. The defendant claims, however, that when the state notified him after jury selection had begun of its intent to perform additional DNA testing, which later resulted in evidence of DNA from both the defendant and the victim being present on the red hooded sweatshirt, his family could not afford the additional funds necessary for a DNA expert. The defendant testified on the record that he had no sources of income, owned no property and had no money in any bank account.

The trial court denied the defendant's motion for costs because it determined that the defendant was required to seek funding from the Public Defender Services Commission (commission) and, thus, the court could not make a finding of indigency. The trial court then provided the defendant with the opportunity to file an application with the commission to investigate his claim of indigency but the defendant declined.

As I have mentioned, I ultimately agree that the record is inadequate in this case to address the defendant's constitutional claim or to afford him relief. Specifically, as I will discuss, because the defendant never filed an application with the commission, it is not clear that the commission would have in fact required him to choose between receiving funding and continued representation by his private attorney, thereby potentially bur-

dening his constitutional right to counsel of his choice. Additionally, despite the defendant's unchallenged testimony, it is not perfectly clear on this record that the defendant would have been found indigent by the commission, or could have been found indigent by the court. Nevertheless, I am troubled by several aspects of this case.

First, I am concerned how the actions and inactions of different state actors—focused on their own missions—might in some cases combine to jeopardize a defendant's constitutional rights. I will address these actors in turn.

Like the trial court, I cast no aspersions of bad faith on the prosecution. Most of us, while in the practice of law or in public service, have missed deadlines or been overwhelmed by other demands. However, it is too easy for the state simply to acknowledge its untimely disclosure, argue that the public interest should not suffer for the prosecutor's mistake, and suggest that with a continuance all will be well. No one is well served when rules are not followed. Putting aside the inconvenience and cost to the court, to opposing counsel and to jurors summoned and discharged, a late disclosure, as in the present case, might prejudice an accused's constitutional rights, or at least create a claim on appeal that could have been obviated. And a continuance of the trial—which, in this case, was in its incipient stage—will not necessarily cure all the harm. In reliance on a firm trial date and the state's actions or inactions, the defendant and his counsel are likely to have taken positions or made choices that will likely be held against the defendant as "strategic" if he is convicted and challenges his conviction in another forum. See, e.g., *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 521, 964 A.2d 1186 ("the decision whether to call a particular witness falls into the realm of trial strategy, which is typically left to the discretion of trial counsel"), cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009). For related reasons, it is not difficult to find cases in which parties have been precluded from disclosing experts in analogous situations.[4] See *Hicks* v. *State*, 287 Conn. 421, 445, 948 A.2d 982 (2008) (in negligence case, trial court did not abuse its discretion by precluding untimely disclosed expert because trial already had commenced); *Pool* v. *Bell*, 209 Conn. 536, 541–42, 551 A.2d 1254 (1989) (in medical malpractice case, trial court did not abuse its discretion by precluding untimely disclosed expert because delay was due to improper " 'cat and mouse' " game and plaintiff would have had little time to discover and investigate expert's opinions); see also *Gyerko* v. *Gyerko*, 113 Conn. App. 298, 317, 966 A.2d 306 (2009); *Tornaquindici* v. *Keggi*, 94 Conn. App. 828, 848, 894 A.2d 1019 (2006).

In the present case, the defendant claims that by the

time of the late disclosure, on the basis of the state's framing of the case, he already had retained an identification expert with the money his wife was able to muster for his defense. His privately retained counsel represented that the defendant's wife was not in a position to pay for another expert. We do not have a record that would test whether this representation is accurate but it is certainly plausible that if the state had timely disclosed the DNA expert, the defendant would have allocated his resources differently. Yet, after placing the defendant in this dilemma, once its motion for untimely disclosure was granted, the state expressed no interest in the resolution of the funding issue, stating that that was between the defendant and the commission. Most troubling to me about the prosecution's indifferent position is that it's accurate: one arm of the state (the prosecution) having created the problem and another (the court) having countenanced the state's late disclosure, it was not the prosecution's problem to resolve. Instead, the court directed the defendant to a third agency of the state (the commission) for help. But as we will see, for its own reasons, the commission—predictably and somewhat understandably—did not embrace its role as the default fiscal source for such unique situations. Rather, the commission has taken the position that even if the defendant in this case was constitutionally entitled to the funding he sought, the commission was not required to provide this funding because it is only required to fund defense costs for its own clients, and "[t]here is no funding that is appropriated by the legislature to pay for defense costs of the private bar who represent they have run out of money to pay for experts, investigators and other defense costs." The commission took a similar stance in *State* v. *Wang*, 312 Conn. 222, 92 A.3d 220 (2014), arguing that there was "no statutory authorization or funding appropriated for [it] to pay for experts or investigation from its budget for a pro se litigant who is not its client."

Second, I am concerned that aspects of the majority's reasoning might be read to unduly limit the trial court's and this court's ability to review and resolve legal claims that arise when an indigent defendant's due process right to present a defense, which entitles him to funding for expert costs, is intertwined with his right to counsel. As in *Wang*, the majority in the present case declares that the Judicial Branch is not authorized to fund reasonably necessary defense costs. See *State* v. *Wang*, supra, 312 Conn. 256 and n.33. The court in *Wang* suggested that a court order that funds be made available in these instances might offend notions of separation of powers by "usurp[ing] the power of the legislature to devise a state budget." Id., 256 n.33. Further encroachment would occur, the court reasoned, if a court were itself to make a finding of indigency rather than the commission in the first instance. Id., 263–64. Although ultimately the defendant does not ask us to

overrule *Wang*, I think both propositions might be somewhat overstated.

I believe, rather, on the basis of those same separation of powers principles, that it would be reasonable to conclude that the judiciary—an independent branch of government—would not be prevented from paying for such costs itself if a court determined they were constitutionally necessary. True, the Judicial Branch might not have received a specific appropriation for such costs. If we listen closely to the position of the commission, however—both in *Wang* and in the present case—neither has the commission. See id., 246 n.24. The commission's point is that it has projected its *own* expenditures and been appropriated funds that are based on the needs *of its own clients*, not the needs of someone else's clients, the needs of those defendants who run out of money or the needs of those representing themselves. After this case, the commission might have to ask the legislature to adjust its budgetary projections on the basis of additional responsibilities it had not previously anticipated, as it had to do after *Wang*.[5]

At the very least, nothing prevents a court from declaring what the constitution demands, leaving it to the legislative and executive branches to determine which state agency should pay for it. This court has at times indicated that it does not offend the separation of powers to issue rulings that would have costs beyond what has been budgeted, leaving it to the political branches to determine how to allocate those costs. See *Pellegrino* v. *O'Neill*, 193 Conn. 670, 675–76, 480 A.2d 476 ("[T]he judiciary, as an independent branch of government, has inherent power to direct other governmental agencies to provide such funds as may be necessary for the reasonably efficient operation of the courts. . . . In the absence of a special appropriation the existence of a law requiring an expenditure to be incurred is an appropriation of money for that purpose, and the law imposes on the comptroller the duty of settling and adjusting demands against the state for such expenses." (Citations omitted; internal quotation marks omitted.)), cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984); see also *Pamela B.* v. *Ment*, 244 Conn. 296, 329, 709 A.2d 1089 (1998) (explaining that court orders pertaining to judicial resources are not improper merely because "there are many competing constraints upon the resources the judicial department has available with which to satisfy other constitutional mandates"). The question of which agency pays for constitutionally necessary costs should not drive our analysis or prevent us from deciding a legal issue properly presented. See *In re Taijha H.-B.*, 333 Conn. 297, 335–36, 216 A.3d 601 (2019); id., 335 ("the benefits of obtaining a second opinion in the form of some limited judicial review of counsel's no merit determination more than offset the potential costs").

Commendably, in my view, Judge Devlin cut to the chase in *State* v. *Garvins*, Superior Court, judicial district of Fairfield, Docket No. CR-16-293596-T (December 12, 2017) (65 Conn. L. Rptr. 596), in which the defendant was represented by pro bono counsel who requested that the trial court approve funding for a psychiatric examination after the commission had denied his request on the ground that the defendant was being represented by privately retained counsel. Judge Devlin convened a hearing on the matter at which counsel for the commission appeared and represented that although the defendant satisfied the indigency requirement, he was not eligible for funding for defense costs by the commission because he had private counsel and, thus, was not the commission's client. Id. The court disagreed. On the basis of a financial affidavit, the court independently found that the defendant was indigent, determined that the requested examination was "reasonably necessary" to "formulate and possibly present a defense based on mental disease or defect"; id.; and determined that it was unconstitutional to force an indigent defendant to choose between his due process right to present a defense and his right to counsel. Only then did the court pose the question on the lips of all agencies involved: "[W]here should the public funds come from to pay such expense . . . ." Id., 597. Judge Devlin granted the defendant's motion for funds, ordered the defendant to follow the commission's protocol for applying for the funds, and ordered the commission not to unreasonably deny the funds. Id., 596.

I do not believe these determinations of questions squarely presented offended the separation of powers doctrine. Following the reasoning of *Wang*, Judge Devlin answered the legal question at issue between the defendant and the commission—whether the defendant was eligible to receive funding from the commission despite representation by private counsel—and in doing so vindicated the core missions of the Judicial Branch: resolving disputes and protecting the rights of litigants.

If the defendant and the trial court in the present case had followed a similar procedure—if the defendant had applied for funding with the commission, the commission had denied funding due to an unresolved legal issue, and the trial court had determined the defendant's eligibility for funding in light of his representation by private counsel—I do not believe that the court would have acted outside its authority. Even if the trial court believed it could not have made the indigency determination, it certainly could have sent the defendant off to the commission with a ruling that if the defendant was indigent, then in fact the commission must provide him with reasonably necessary funds for expert witnesses, irrespective of whether he had private counsel.

Nevertheless, I cannot conclude that the majority is incorrect that our statutes generally contemplate—

and that it is appropriate policy—that a defendant should in the first instance proceed through the commission to determine whether he is indigent, regardless of whether he is represented by a public defender or an attorney assigned to him by the commission or by private counsel. See *State* v. *Wang*, supra, 312 Conn. 250–51; id., 251 (explaining history and purpose of commission, including that commission was "charged . . . with [the broad purpose of] protecting the rights of indigent defendants"). But, to the extent that the majority seems to create an exhaustion-like requirement (i.e., the defendant *must* proceed through the commission for a predicate finding of indigency before turning to the courts), I have some concerns.

It is unclear to me that there was a defined path as to how the defendant was supposed to navigate this situation, which, I again note, was not of his own making but was a result of the prosecution's untimely action. Typically, in cases implicating the exhaustion of administrative remedies, it is clear both that a party must exhaust those remedies and how to go about doing so. *Wang* itself specifically confined its applicability to indigent self-represented defendants. Id., 239 n.18. It did not chart a path forward for how to proceed when the defendant is represented by pro bono counsel and is indigent, or is represented by privately retained counsel but has *become* indigent. That this is true is evidenced by the positions taken by the commission in both *Wang* and this case.

Although in the present case, the majority, like the trial court, suggests that the commission might have permitted the defendant to retain his private counsel and still access funding for defense costs,[6] the commission, appearing as amicus curiae in this case, threw cold water on that notion. In fact, the commission's internal policy manual states flatly—after *Wang*—that it will not provide funding for experts to indigent defendants with private counsel. In its amicus brief to this court, the commission explains that, because *Wang* did not determine whether a defendant represented by private counsel could obtain state funding for costs, it has "adopted a policy that only indigent pro se litigants or individuals represented by a public defender or assigned counsel can access funding for experts or other expenses. If a person represented by a private attorney seeks funding, they must also accept representation from the public defender or proceed pro se. The private attorney must withdraw his appearance. The case will be referred to the local public defender office for an eligibility determination and, if the defendant is indigent, the case will be assigned to an attorney in the office or to assigned counsel if there is a conflict of interest."

The policy manual does provide a possible workaround—once private counsel is removed, the commis-

sion may appoint the same previously retained private counsel as assigned counsel if the best interest of the client so warrants. Although the commission has informed this court that this procedure recently has been followed in at least one other case, it is unclear whether it routinely allows indigent defendants to keep their previously retained private counsel. In fact, the commission's policy manual suggests that such an arrangement would be an exceptional circumstance.[7] Thus, with the benefit of hindsight and briefing it is fine to parse the commission's position and conclude, as the majority does, that "we do not understand the [commission's] amicus brief to suggest that the relationship with private counsel must be terminated before the commission conducts an initial investigation of indigency and reviews the application for assistance with defense costs; rather, we understand that policy to suggest that any defendant seeking public funding for defense costs must ultimately accept representation from the public defender or proceed as a self-represented party prior to receiving such funding once eligibility is determined." (Emphasis omitted.) But the defendant in the present case had to decide what to do at a time when his trial was about to begin, and with at least some uncertainty, given the commission's articulated policy and litigation positions, as to whether he would end up with his constitutionally entitled counsel of choice: counsel who had prepared his case with him and already had begun picking a jury before the state's late disclosure.[8] The majority might not be "convinced that, simply by applying to the public defender's office, the defendant would be compelled to forgo his right to counsel in order for the public defender's office to make an indigency determination," but that was not of comfort to the defendant at the time. He had no assurances that he would receive counsel of his choice.

Nevertheless, because the defendant never applied to the commission in this case, and because we cannot know if the commission would have required the defendant to dismiss his private counsel to access funding for expert costs or would have found him indigent, we cannot reach the defendant's constitutional claim. I emphasize, however, that rather than setting up roadblocks, state actors should be cognizant of their responsibility to provide a clear pathway for indigent defendants to access the resources to which they are constitutionally entitled. It should be made clear to indigent defendants that, to access funding for defense costs, they first must apply with the commission but that if they are denied funding—for any reason—they may then seek review by the trial court. Under those circumstances, the trial court not only has the authority, but is obligated, to resolve any legal claims that arise, such as whether a defendant's right to counsel is violated by conditioning his constitutional right to funding for defense costs on representation by a public defender

or an attorney assigned to him by the commission. Although the commission is the state entity responsible for determining indigency in the first instance and providing funding for defense costs, it is imperative that state actors—including the court and the prosecution—work in tandem to ensure that indigent defendants are aware of this procedure, especially when the need for additional funding is, at least in part, the byproduct of a state actor's untimely actions.

[1] See, e.g., *State* v. *Webb*, 128 Conn. App. 846, 852–83 n.3, 19 A.3d 678 (generally describing national CODIS database), cert. denied, 303 Conn. 907, 32 A.3d 961 (2011).

[2] This "hit" occurred three years before the defendant's arrest. The state never sought confirmatory evidence from the defendant until jury selection had begun.

[3] On appeal, the defendant does not challenge this ruling.

[4] Although the defendant does not challenge the trial court's decision in this case to permit the untimely disclosure, and ultimately the DNA expert's testimony, the apparent unfairness of the state's untimely disclosure and its effect on the defendant should be noted. When the state disclosed this expert, two jurors had already been chosen and had to be discharged. Although the trial court made no finding of bad faith, and I attribute none to the state, surely this taxes the court's indulgence. Reliance on the stakes of the case to the public and the victim to justify such late disclosures promotes neither compliance with the rules, the public's interest nor the constitutional interests of the accused.

[5] After *Wang*, the commission in 2015 requested deficiency appropriations of approximately $6.3 million, caused, in part, by this court's decision in *Wang*. See Conn. Joint Standing Committee Hearings, Appropriations, Pt. 15, p. 6730, written testimony of Susan O. Storey, Chief Public Defender, Division of Public Defender Services, concerning House Bill 6825, April 21, 2015, available at https://www.cga.ct.gov/2015/appdata/tmy/2015HB-06825-R000421-Agency%20-%20Office%20of%20the%20Chief%20Public%20Defender%20-%20Susan%20O.%20Storey-TMY.PDF. The commission represented that it had not budgeted for the costs associated with *Wang* because "[h]istorically, these expenditures had been court ordered and paid for by the [j]udicial [d]epartment." Id. It was noted, however, that during the 2015 fiscal year, there was only one indigent self-represented defendant who required expert witness funding. See Analysis of Finance Advisory Committee Meeting Items, concerning House Bill No. 6825 (March 5, 2015), available at https://www.cga.ct.gov/ofa/Documents/year/FAC/2015FAC-20150305_March%202015%20OFA%20Analysis%20of%20FAC%20Budgetary%20Transfers.pdf.

[6] As the majority explains, "the trial court expressly stated that Kaloidis would be permitted to continue to represent the defendant during the application process and offered the defendant other options, such as continuing to represent the defendant as a special public defender, standby counsel, or with cocounsel, to be determined later."

[7] The commission's policy manual states: "It is the policy of the [c]ommission that the Office of Chief Public Defender (OCPD) should not assign a case to any attorney for compensation as an [a]ssigned [c]ounsel after that attorney has been previously privately retained in that case, *unless the OCPD determines that such appointment would be in the best interests of the client.*" (Emphasis added.)

[8] I note that this could raise other constitutional concerns, for example, whether requiring a defendant to abide by the commission's stated procedure of requiring a defendant to fire his private counsel and accept representation by the commission to obtain funding for defense costs unconstitutionally burdens his rights to counsel and to present a defense. In the present case, the trial court's suggestions for how the commission might handle the situation appear merely speculative. However, because the defendant in the present case did not file an application with the commission, and thus we do not know if the commission would have required the defendant to fire his private counsel to obtain funding, the record is inadequate to review this issue.